# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| DONALD A. SPIDELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 1:14-cv-02242-JEO |
| ) | |
| PUBLIX SUPER MARKETS, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This is an employment discrimination case originally brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. (Doc.[1] 1). It is before the court on Defendant's motion for summary judgment. (Doc. 19). The parties have consented to the jurisdiction of the undersigned. *See* 28 U.S.C. § 636(c). (Doc. 26). Upon consideration, the court finds the motion is due to be granted.

**I.     FACTS**[2]

Spidell began working for Publix on June 2, 2012, as a deli clerk. He was transferred to a seafood clerk position on June 30, 2012. (Ex. B (Doc. 21-2 ); Ex. C (Doc. 21-3) ¶ 2). He

---

[1] References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files system.

[2] In deciding a motion for summary judgment, the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). The factual statements in this section of the court's opinion do not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007) (noting that "a summary judgment proceeding ... by definition involves no findings of fact").

remained in that position until his termination on November 2, 2013. (*Id*.)

Spidell received and signed for the written store policies for the Chelsea store (Store No. 1370) when he stated working. (Spidell Dep. (Ex. D (Doc. 21-4) at 46-47[3] and Ex. E (Doc. 21-5)). The "10 Minute Breaks" policy at the store provided: "Before going on a 10 minute break (as business allows) you must check with your Department Manager/Assistant Department Manager or the Manager in Charge." (Spidell Dep. at 47-48; Ex. F (Doc. 21-6)). The breaks are normally given every four hours and are to be "scheduled to meet the business needs of the department." (Ex. F (Doc. 21-6)). Spidell understood that if the department was busy or understaffed, a request for a break might not be granted. (Spidell Dep. at 48).

Publix had other policies that were applicable to its employees including a theft policy, which provided that "[i]ntentionally recording or reporting work time that results in you (or another associate) being paid for time not worked" may result in termination. (Spidell Dep. at 49; E x. J (Doc. 21-10)). Publix's "Rules of Unacceptable Conduct" also enumerate the following acts which can result in termination of an employee: (1) "Dishonesty of any kind"; (2) "Falsifying personnel or company records, or any other information furnished by Publix"; (3) "Inefficiency or neglect of work or responsibilities; wasting time during work hours (for example, loafing, talking, sleeping, etc.)"; and (4) "Failure to comply with rules that have been established by individual stores." (Ex. K (Doc 21-11)). Spidell was aware that a violation of one of these rules could result in his termination. (Spidell Dep. at 53-54).

After Spidell was transferred to the meat department as a seafood clerk on June 30, 2013,

---

[3]Further references to Spidell's deposition herein will be tagged by "Spidell Dep." Page numbers are to the deposition pages, not the Clerk's electronic pagination.

he began taking his 10 minute breaks along with his meal time. (*Id*. at 82-85). According to Spidell, his department manager, Gary Johnson, gave him permission to do this. (*Id*. at 75-59, 88-89). Spidell also failed to report to work immediately after clocking in for his shift on a number of occasions. Spidell explained the delay by stating during his deposition that Johnson had him "doing things, like, going to get food when I'd clock in, and I'd walk to Bojangles." (*Id.* at 76).

Lynne Jarnagin became the Chelsea store manager in September 2013. Around the end of September 2013, she was alerted by an associate to the possibility that an employee in the meat department, Perry Sanders, was "stealing time." (Ex. M (Doc 21-13) at 1). Jarnagin began an investigation by reviewing Publix's closed circuit video footage at the store. (Jarnagin Dep. (Ex. J) (Doc. 21-8) at 33[4]). During her review of the tapes, Jarnagin noticed Spidell sitting outside the store, walking in the store to punch in, and then going back outside to sit down. (*Id*.) She noted other violations, including the following:

1.  [On] October 1, 2013, [Spidell] left the Seafood Department at 3:39 p.m. and walked out the front door of the store, without clocking out, at 3:44 p.m. [He] then walked back into the store and proceeded to the break room where he clocked out for his meal break at 3:51 p.m. At 4:40 p.m., [Spidell] walked back into the break room and clocked back in. However, instead of returning to his duties in the Seafood Department, [Spidell] remained in the break room. At 4:49 p.m., [he] walked out of the break room and returned to work in the Seafood Department at 4:52 p.m.

2.  [On] October 3, 2013, [Spidell] left the Seafood Department at 3:51 p.m. and walked to the break room where he clocked out for his meal break at 3:56 p.m. [He] clocked back in from his meal break at 4:43 p.m. However, instead of returning to work, [he] walked outside of the store. At 4:50 p.m., [he] reentered the store and went to the Seafood Department

---

[4]Further references to Jarnagin's deposition herein will be tagged by "Jarnagin Dep." Page numbers are to the deposition pages, not the Clerk's electronic pagination.

       where he began working.

3.     [On] October 4, 2013, [Spidell] left the Seafood Department at 1:37 p.m. and walked out the front door of the store.  At 1:50 p.m., [he] reentered the store, walked to the break room, and clocked out for his meal break at 1:51 p.m.  [He then] ... walked out the front door of the store.  At 2:33 p.m., [he] entered the store, without his Publix shirt on, and walked to the break room.  [He] clocked back in from his meal break at 2:33 p.m.  However, instead of returning to work, [he] left the store again.  At 2:46 p.m., [he] re-entered the store wearing his green Publix shirt and went into the restroom.  At 2:54 p.m., [he] finally returned to work.

(Ex. C (Doc. 21-3) at 2-3; Ex. M (Doc. 21-13) at 1-2).  Jarnagin reported her findings to District Manager James Mowery and Retail Associate Relations Specialist Jonathan Hartman.  She indicated in her email to them that she wanted to terminate Spidell.  (Ex. N (Doc. 21-14) at 1).  Jarnagin was told to speak with Spidell and listen to his explanation.  (*Id.*)

     Jarnagin confronted Spidell about his conduct during the morning of October 18, 2013.  He told her that he had been taking his breaks in that manner because "we don't get to take our 10 min. break so I take them then."  (Ex. O. (Doc. 21-15) at 1).  He also stated that "he had not been taking his breaks at the beginning of a shift or at the end of a shift or after a meal" since she (Jarnagin) "had put a ten minute meal sheet out."[5]  (Jarnagin Dep. at 32).  Jarnagin went back and reviewed additional tapes and determined that Spidell had done "the same thing that day."[6]  (*Id.*

---

[5]In early October 2013 Jarnagin implemented a new policy requiring employees to sign in and out for their ten minute breaks.  (Jarnagin Dep. at 14-15).  Prior to the change, breaks were monitored by department managers.  (*Id*. at 19).

[6]Jarnagin determined the following:

1.     [On] October 16, 2013, [Spidell] entered the store, in uniform, and clocked in for his shift at 3:54 p.m.  [He] then left the break room but did not report to work until 4:02 p.m.

2.     [On] October 17, 2013, [Spidell] entered the store and clocked in for his

4

at 32-34). She concluded that he was being dishonest and should be terminated. (*Id*. at 34). She called him back later that day to present him with an "Associate Counseling Statement" concerning the violations.[7] (Ex. P (Doc. 21-16)). It states that Spidell did not report to his department after beginning his shift or after ending his meal breaks on numerous occasions. (*Id*.) Spidell retorted that he was not aware he was doing anything wrong by taking his breaks with his meals. (*Id*.) Jarnagin suspended Spidell pending further review. (*Id*.) Jarnagin also sent an email later that day to Mowery detailing Spidell's activities and stating that she believed there was enough to terminate Spidell. (Ex. O (21-15)). She also sent a second email to Mowery detailing how Spidell had not been truthful concerning his breaks after the sign out sheet was instituted. (*Id*. at 2).

On October 29, 2013, Jarnagin e-mailed Mowery to see if he had an opportunity to review her termination recommendation concerning Spidell. (*Id*.) Spidell was terminated on November 1, 2013, for time records violations. The discharge notice specifically stated: "On numerous occassions [sic] Donald began his shift and then go [sic] outside (set [sic] outside) for excessive amount [sic] of time before going to his assigned work location." (Ex. Q (Doc. 21-17)).

---

       shift at 12:45 p.m. [He] did not report to work until 12:58 p.m.

3.    [On] October 18, 2013, [Spidell] entered the store and clocked in for his shift at 11:45 a.m. [He] did not report to work until 11:58 a.m.

(Ex. C (Doc. 21-3) at 3).

[7]Spidell's supervisor, Gary Johnson, was present to witness the presentation of the write-up to Spidell. (Gary Johnson Dep. (Ex. G) (Doc. 21-7) at 15). Prior to that event, Johnson was unaware of any problems with Spidell. (*Id*. at 11, 14-15, 33-34).

Spidell requested that his discharge be reviewed pursuant to Publix's policies. (Ex. R. (Doc. 21-18)). Therein, he stated that he had multiple personal issues at the time of the incidents, he was "on some pills," and he was "very depressed." (*Id*. at 1). He also complained that other employees violated Publix's rules, but were not fired. (*Id.* at 3). The discharge was upheld. (Doc. 20 at 11).

After Spidell was denied unemployment compensation in the administrative process, he appealed that denial to the Circuit Court of Talladega County. The denial of benefits was affirmed by the court after it determined "that he was discharged for a dishonest act committed in connection with his work." (Ex. S (Doc. 21-19) at 4).

Spidell filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In a letter from the EEOC to Spidell asking if he wished to provide additional information, an investigator noted that Publix asserted, among many things, that Spidell failed to "come in to discuss the matter with Jarnagin" when he was contacted. (Doc. 23-6 at 2). About two months later, the EEOC issued a "Dismissal and Notice of Rights," finding that the agency was unable to conclude that the information provided established any violation. (Ex. U (Doc. 21-21)).

Spidell filed the present action *pro se*, alleging that Publix had discriminated against him on the basis of his race in violation of Title VII and § 1981. (Doc. 1). Publix filed a motion to dismiss the Title VII claim for failure to exhaust his administrative remedies. (Doc. 7). Thereafter, retained counsel filed a response, conceding that the Title VII claim was due to be dismissed. (Doc. 8). Counsel also filed another complaint advancing three claims for relief under § 1981. (Doc. 12). The first claim asserts that Publix subjected Spidell to disparate

6

treatment when it suspended him. The second and third claims assert he was unlawfully terminated because of his race. The court determined the motion to dismiss was moot in view of the amended complaint, advancing claims only under § 1981. (Doc. 13).

Following discovery, Publix filed the present motion for summary judgment. (Doc. 19). The motion is fully briefed (docs. 20, 23 & 24) and supported by evidentiary submissions (docs. 21-1 to 21-21; 23-1 to 23-10; & 24-1).

## II.     STANDARD OF REVIEW

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, a party is authorized to move for summary judgment on a claim asserted against the movant. Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986).

## III.   DISCUSSION

Publix asserts entitlement to summary judgment on the Spidell's claims because he cannot establish a *prima facie* case of racial discrimination and cannot overcome Publix's legitimate non-discriminatory reason for its decisions concerning Spidell.  (Doc. 20 at 16-20).  Spidell disagrees.  (Doc. 22 at 18-30).

### A.   Legal Framework

The court in *Dickinson v. Springhill Hospitals, Inc.*, 397 F. Supp. 2d 1337, 1342 (S.D. Ala. 2005), set forth the applicable law for § 1981 claims such as the plaintiff's:

> .... The Supreme Court and the Eleventh Circuit have addressed § 1981's application in employment discrimination cases.
>
> > Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.  *See, e.g., Johnson v. Railway Express Agency*, 421 U.S. 454, 459-460, 95 S. Ct. 1716, 1720, 44 L. Ed. 2d 295 (1975) (holding unequivocally that § 1981 protects against racial discrimination in private employment).  Section 1981 liability must be founded on purposeful discrimination.  *See General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389, 102 S. Ct. 3141, 3149, 73 L. Ed. 2d 835 (1982); *Lincoln v. Board of Regents of Univ. System of Ga.*, 697 F.2d 928, 935 n. 6 (11th Cir. 1983).
> >
> > A showing of disparate impact through a neutral practice is insufficient to prove a § 1981 violation because proof of discriminatory intent is essential.  *See General Bldg. Contractors Ass'n*, 458 U.S. at 388, 102 S. Ct. at 3149 (recognizing that the drafters of § 1981 were not concerned with practices that were facially neutral); *Lincoln*, 697 F.2d at 935 n. 6.  Accordingly, only direct or inferential modes of proving intentional discrimination are available to the § 1981 plaintiff.  *See Larkin v. Pullman-Standard Div., Pullman, Inc.*, 854 F.2d 1549, 1561 (11th Cir. 1988), overruled on other grounds by *Swint v.*

> *Pullman-Standard, Inc.*, 493 U.S. 929, 110 S. Ct. 316, 107 L. Ed. 2d 307 (1989) (where plaintiff proceeded on a theory of disparate impact, plaintiff is limited to Title VII and cannot seek the broader § 1981 remedies and longer liability period). *Cf. Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (where plaintiff claims only disparate treatment under both Title VII and § 1981, courts may analyze claims together).
>
> The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 2377-78, 105 L. Ed. 2d 132 (1989).

*Dickinson*, 397 F. Supp. 2d at 1342.

In this case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), controls the inquiry. Initially, Spidell must show that (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees who are not members of the plaintiff's class more favorably; and (4) he was qualified for the job or job benefit at issue. *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997). Additionally, in this instance, he must also show intentional discriminatory intent. *Dickinson*, 397 F. Supp. 2d at 1342; *see also Mason v. United Air. Lines, Inc.*, 274 F.3d 314, 318-19 (5th Cir. 2001).

> Once a plaintiff establishes a prima facie case of discrimination, the employer may rebut the resulting presumption of discrimination by articulating at least one legitimate, non-discriminatory reason for its action. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (Title VII context); *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998) (ADEA). Upon doing so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason is a pretext for discrimination. *See Alvarez*, 610 F.3d at 1264; *Watkins*, 153 F.3d at 1314. The plaintiff must meet the employer's reason head on and rebut it, and may not simply quarrel with the wisdom of the reason. *See Brooks*, 446 F.3d at 1163. He may do this either directly by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly by showing that the proffered reason is unworthy of

> credence.  *See Jackson v. State of Ala. Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (§ 1981); *Watkins*, 153 F.3d at 1314.  We must evaluate whether the plaintiff has demonstrated such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason so that a reasonable factfinder could conclude that it is unworthy of credit.  *See Jackson*, 405 F.3d at 1289; *Watkins*, 153 F.3d at 1314.  To demonstrate pretext, the plaintiff must show both that the employer's proffered reason is false, and that discrimination was the real reason.  *See Brooks*, 446 F.3d at 1163.

*Conner v. Bell Microproducts-Futer Tech, Inc.*, 492 F. App'x 963, 964 (11th Cir. 2012).

**B.     Analysis**

    **1.     *Prima Facie* Case**

Publix initially argues that Spidell cannot demonstrate that similarly situated white persons were treated more favorably than he was or that the decision-makers in this case knew of the misconduct of the other comparators and failed to take similar action.  (Doc. 20 at 17-25). United States District Judge Lynwood Smith reiterated the applicable considerations in *Petty v. United Plating*, 5:09-cv-01465-CLS, 2012 WL 2047532 (N.D. Ala. May 31, 2012):

> The following is a concise summary of the Eleventh Circuit's guidance on what is required to show that two employees are similarly situated:
>
>> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted).  We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.  *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is

> neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").
>
> *Maniccia v. Brown*, 171 F.3d 1364, 1368–69 (11th Cir. 1999). Thus, plaintiff must show that employees outside his protected class were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways. *Id.*; *see also, e.g., Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed."). As previously discussed, however, for an employee to be similarly situated in terms of disciplinary actions the supervisor who disciplined the plaintiff must have been aware of the misconduct of the purported comparator. *See Knight*, 330 F.3d at 1317 n. 5; *Gerwens*, 874 F.2d 1542.

*Petty*, 2012 WL 2047532, *17-18. The court also notes, "A plaintiff may, however, withstand summary judgment even in the absence of an adequate comparator if [h]e presents 'a convincing mosaic of circumstantial evidence' that would allow a reasonable jury 'to infer intentional discrimination by the decisionmaker.' " *Washington v. United Parcel Service, Inc.*, 567 F. App'x 749, 752 (11th Cir. 2016) (quoting *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

Spidell alleges in his deposition that four white employees, Stephanie Cook, Dawn Green, Megan (LNU), and David (LNU), committed similar violations like his, but were not terminated. (Spidell Dep. at 149-59). In his brief in opposition to the motion for summary judgment, however, he only argues that Cook is a comparator. (Doc. 22 at 24). Specifically, he states that Jarnagin transferred Cook into the meat department within a week of Jarnagin's arrival at the store. According to Spidell, Cook had duties and responsibilities identical to his and she committed several time record violations about the same time he was terminated, but she was not disciplined. (Doc. 22 at 24). Spidell states that "Cook failed to clock in upon arriving at work, failed to clock out for her meal break, and left the store without clocking out at the end of her

11

shift. However, Cook still was not disciplined  Instead, Cook's department manager and/or an assistant store manager edited Cook's time records to reflect Cook's putative time."[8] (*Id*. at 13, 24-25). He concludes that there is no "race-neutral reason for Spidell to have been subjected to disparate treatment for alleged time record violations. Therefore, Spidell has produced sufficient evidence to support this claim." (*Id*. at 25).

Spidell has not demonstrated a *prima facie* case for a multitude of reasons. First, it is unclear whether Cook's time punches and associated edits involved any misconduct on her part. For instance, some appear to involve system glitches; others may be simple failures to punch in at the beginning of the day, which causes the system to not register subsequent punches for the day; and others may be a result of Cook punching in too early. (*See* Jarnagin Dep. at 57-62; Pl. Exs. 14 & 15 (Doc. 23-4 & 23-5)). What is clear is that the court cannot find from the evidence before it that Cook's situation is similar to Spidell's situation under the evidence and circumstances. Second, and most importantly, there is no evidence that Jarnagin had any knowledge of these allegedly similar issues concerning Cook. To the contrary, Jarnagin testified that the only issue Cook had concerned one absence and three tardies during the relevant evaluation period (April 2013 - September 2013) (Ex. V (Doc. 24-1) at 1), which was within acceptable limits under Publix's attendance policy. (Jarnagin Dep. at 45-48). Absent Jarnagin's knowledge of similar violations of misconduct by Cook, there is a lack of commonality for purposes of considering her a comparator. *See Petty*, 2012 WL 2047532, *17-18. Third, the undisputed evidence shows that the review of the video tapes that led to the discovery of

---

[8] Two of Cook's "Time Statement Report" cards show edits by Johnson and Walsh during the second half of October 2013 and November 1, 2013. (Doc. 23-4 & 23-5).

Spidell's actions was precipitated by allegations that another employee, Perry Sanders, was involved in purported misconduct concerning improper time punches. (Jarnagin Dep. at 35-37). There is no evidence that any video demonstrates similar violations by Cook.[9]

Publix also argues that Spidell has failed to show that he was replaced by Cook or any other less qualified white employee. (Doc. 20 at 23-25). While that appears to be true, Spidell "may, however, withstand summary judgment even in the absence of an adequate comparator if [h]e presents 'a convincing mosaic of circumstantial evidence' that would allow a reasonable jury 'to infer intentional discrimination by the decisionmaker.' " *Washington*, 567 F. App'x at 752 (quoting *Smith*, 644 F.3d at 1328). As will be further discussed below, this he has failed to do.

To the extent Spidell attempts to demonstrate racial animus on the part of Jarnagin, the court finds the evidence lacking. He initially argues that the day Jarnagin arrived at the store as the manager, Gary Johnson told him (Spidell) that Jarnagin "don't like blacks, she's going to get rid of all the blacks." (Spidell Dep. at 60-61). Johnson's statement concerning Jarnagin does not constitute the type of evidence this court can rely upon in considering a motion for summary judgment. Spidell never heard Jarnagin say she did not like blacks, was going to get rid of the

---

[9]The court does not find Cook's failed drug test on June 20, 2014, material. While she was not suspended or terminated, she was removed from work until she contacted the employee assistance program. (Jarnagin Dep. at 51; Pl. Ex. 11 (Doc. 23-8) at 1). This appears to be consistent with Publix's policy. (Ex. W (doc. 24-1) at 4). Similarly, her October 10, 2014 counseling for allowing a customer to leave without paying for his groceries does not make her a comparator for purposes of this case. As best the court can discern, her actions did not involve purposeful misconduct, but involved inattentiveness. (*See* Pl. Ex. 12 (Doc. 23-9) at 1 ("Stephanie must be more attentive while cashing. Focus on every customer.")). Cook was written up and told she would be removed from the cashier position for 30 days and she would receive retraining if she had another incident. (Jarnagin Dep. at 53; Pl. Ex. 12 (Doc. 23-9)).

blacks, or any words to that effect. Spidell does not explain what Johnson's conclusory statement is premised upon. As best the court can discern from the record, it appears to be unfounded speculation.[10]

### 2. Pretext

Even if Spidell could somehow establish a *prima facie* case, he would still need to overcome the Publix's proffered reason for his termination by showing the reason is pretextual. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). In support of pretext, Spidell argues that the evidence demonstrates the following: (1) "Cook committed several time records violations" but "was not disciplined" (doc. 22 at 28); (2) Jarnagin failed to review the store's video for other violations by Cook (*id*. at 29); (3) Jarnagin was dishonest with Johnson and Spidell about the action she intended to take against Spidell (*id*.); and (4) Publix wrongly told the EEOC that Spidell was terminated because he refused to come back to discuss his situation with Jarnagin after he was suspended (*id*. at 30).

#### a. Cook

For the reasons stated previously herein, the court is not impressed with the argument that Jarnagin's failure to discipline Cook demonstrates pretext. In view of the fact that there is no evidence that Jarnagin was aware of such purported violations by Cook, her failure to act,

---

[10]While courts generally do not consider inadmissible hearsay when deciding a motion for summary judgment, "the district court may consider a hearsay statement if the statement could be reduced to admissible form at trial." *Parks v. City of Birmingham, Ala.*, 2015 WL 1487152, *2, n.4 (N.D. Ala. Mar. 30, 2015) (J. Blackburn) (quoting *Hill v. Manning*, 236 F. Supp. 2d 1292, 1297 (M.D. Ala. 2002) (citing *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)). Here, it is unlikely this evidence will be admissible because Johnson denies making the statement to Spidell and there is no alternative basis offered for its admission.

presuming they are similar, does not demonstrate pretext.[11]

### b. Store Video

Spidell next argues that Jarnagin's failure to view the store's video for other violations by Cook demonstrates pretext. (Doc. 22 at 29). The court disagrees. This argument misses the point. Jarnagin was in the process of reviewing the video footage for time violations by Perry Sanders when she observed Spidell engaging in the prohibited conduct. It is undisputed that at that time, Jarnagin had no reason to examine the store's video for violations by Cook since she was unaware of any such allegations. Additionally, Spidell does not dispute that he engaged in the prohibited conduct. Instead, he now argues that he had permission from his manager (Johnson) to do so. The problem with this contention is that Spidell did not raise this issue prior to his suspension or his termination. Specifically, there is no evidence he told Jarnagin, or anyone else prior to his termination, that he was authorized to take his breaks in that manner.[12] (*See* Spidell Dep. at 93-96; 113-16; 126-30; 179-80). To the contrary, even in his request for review of his discharge under Publix's policies, he did not mention that fact. (Ex. R. (Doc. 21-18)). Instead, he stated that he had multiple personal issues at the time, including that he was "on some pills" and he was "very depressed," and other employees violated Publix's rules, but were not fired. (*Id.* at 1-3).

### c. Jarnagin's Decision to Suspend Spidell

Spidell argues that Jarnagin was dishonest in failing to inform him and Johnson that she

---

[11]The court again notes that it is not convinced that Cook's situation is sufficiently akin to the violations involving Spidell.

[12]Spidell stated in his deposition that he expected Johnson to raise the matter during the meeting. (Spidell Dep. at 93-94).

intended to terminate him. (Doc. 22 at 29). Instead, he asserts the statement that he was suspended demonstrates pretext. The court again disagrees.

When Jarnagin counseled Spidell at the time of the suspension and presented him with the write-up for his conduct, the document clearly stated that Spidell was "suspended pending review." (Ex. P. (Doc. 21-16)). While Jarnagin did unequivocally testify that she made her decision to terminate Spidell when she "reviewed the camera and seen [sic] that he was dishonest about his actions and he was doing it after the sign-out sheet was installed," she did inform Spidell that he was suspended pending review. (Jarnagin Dep. at 33-35). Thereafter, she followed corporate procedures, which required her to obtain approval from her District Manager and Retail Associate Relations Specialist before proceeding with the termination. (*See* Ex. O (Doc. 21-15) at 1-3; Ex. C (Doc. 21-3) at 4). Upon receiving the requisite approval, she terminated Spidell. (Ex. Q (Doc. 21-17)). These circumstances do not demonstrate pretext.

### d. EEOC Letter

Spidell next argues that pretext has been demonstrated by the fact that Publix falsely informed the EEOC that he was terminated because he refused to come back to discuss his situation with Jarnagin after he was suspended. (Doc. 22 at 30). This assertion is premised upon the following facts.

Publix responded to Spidell's EEOC charge, which led to a lengthy letter from the EEOC investigator detailing Publix's position concerning his termination. In pertinent part, it states:

> Respondent denied the allegations of discrimination, and contends that Sherri Ogbozar, White Female Team Leader, was performing the store's weekly payroll function [w]hen she noticed Perry Sanders, Meat Clerk, did not have a meal break recorded the prior day, even though she witnessed him outside the store while he was on break. Ogbozar informed Lynne Jarnagin, Store Manager, of the matter.

> The closed circuit television was checked to see if Sanders was on an actual meal break or a 10 minute break. When it was reviewed, it was noticed that he was away from his area for approximately 10 minutes. Respondent contends that it noticed that you entered the store at 2:33 p.m., walked into the associate lounge, and then quickly exited the associate lounge. Respondent contends that instead of returning to your work area, you went back outside the store and remained there until 2:46 p.m. before you finally entered the store again and returned to work. Respondent contends that your time records were reviewed and you clocked in at 2:33 p.m. Respondent contends that it decided to review other records and found that on October 21, 2013, you entered the store at 4:39 p.m. went into the lounge and remained until 4:48 p.m. before returning to work. On October 3, 2013, it was also discovered that you entered the store at 4:42 p.m., went into the lounge and exited the lounge before going back outside. Respondent further contends that you remained outside until 4:50 p.m. Respondent contends that on October 18, 2013, Jarnagin met with you to discuss your time record violations and stated it was discovered that you failed to return to work after clocking in from several meal breaks. Respondent contends that you admitted to your misconduct but tried to justify your actions by claiming you were often busy in the Seafood Department and did not get an opportunity to take 10 minute breaks. Respondent contends that you claim that you were taking your 10 minute breaks in conjunction with your meal breaks. Respondent contends that you were advised that you were being suspended pending further disciplinary action. **Respondent contends that you were contacted to come in to discuss the matter with Jarnagin, however you refused.** After being terminated you elected to participate in the Resolution Process and claimed your discharge was based on your race. There is no evidence that similarly-situated White employees were treated more favorably under the same or similar circumstances. Further, there is no evidence to support your claim of retaliation.

(Pl. Ex. 12 (Doc. 23-6) at 1-2 (bold added)). The letter then asked Spidell if he wanted to provide any contrary information before a decision was issued by the District Director. (*Id.* at 2).

Publix argues that the highlighted statement in the letter from the EEOC investigator "is a clear misstatement." (Doc. 24 at 16). It also notes that Spidell has failed to supply the court with a copy of Publix's actual response to the EEOC.[13] (*Id.*) It further notes that "Publix has remained consistent in setting forth its reasons for its decision to terminate" Spidell. (*Id.*)

---

[13] While this is correct, Publix has not provided the court with a copy of its submission either.

What is clear from the record before the court is that there is no indication other than the conclusory, hearsay statement of the EEOC investigator, that Publix changed its position as to why Spidell was terminated.  Jarnagin's initial email to her supervisors references time violations, not a failure on Spidell's part to discuss the matter, as the basis of the termination. (Ex. N (Doc. 21-14) at 1-2).  Spidell's discharge paperwork reflects that the reason for the discharge was "time records violations." (Ex. Q (Doc. 21-17)).  The unemployment proceedings in the Circuit Court of Talladega County reference only time violations, which the court found disqualified Spidell from benefits because they involved dishonesty in connection with his work. (Ex. S (Doc. 21-19)).  There is no indication in the opinion of the Circuit Court that Publix offered an alternative defense.  Thus, this court finds that the EEOC investigator's statement in the letter is insufficient to show the requisite pretext to overcome the motion for summary judgment.

## IV.     CONCLUSION

Premised on the foregoing, the court finds that the defendant's motion for summary judgment (doc. 19) is due to be granted.  An appropriate order will be entered.

**DONE**, this 29th day of June, 2016.

_/s/ John E. Ott_
**JOHN E. OTT**
Chief United States Magistrate Judge